Gregory Bartko. Mr. Samuel? May it please the Court, my name is Don Samuel. I'm an attorney practicing in Atlanta, Georgia, and along with Amanda Clark Palmer, who's with me here today, we represent the appellant Gregory Bartko. We were also trial counsel in the Eastern District of North Carolina. Mr. Bartko was charged in an indictment returned in the Eastern District of North Carolina, charged with conspiracy to commit mail fraud, to sell unregistered securities, and to commit the offense of money laundering. There were also substantive counts of mail fraud and the sale of unregistered securities. The crimes involved efforts to raise money for two private equity funds. The first, Caledonian, was involved in raising money in the early part of 2004, January through March or April of 2004. The second aspect of the conspiracy occurred at the end of the year, 2004 through early 2005, with Mr. Bartko's effort to raise money for a separate private equity fund known as the Capstone. The Caledonian fund raised money primarily from a man named John Colvin. The Capstone fund raised money primarily from three other individuals, each of whom testified at trial. The government's theory at the trial was that Mr. Bartko knew that the money that was raised for the Caledonian fund was raised through fraudulent means. It was raised by a man named Hollenbeck, who deceived investors into believing that their investments were guaranteed, deceived investors into believing that their investments were insured. With regard to the Capstone fund, the government also claimed, established at trial, that Mr. Hollenbeck again defrauded investors through the use of phony insurance policies, supposedly insuring their investments, and through false representations about the guaranteed nature of their return. In addition, with regard to the Capstone fund, Mr. Hollenbeck was operating after having received a cease and desist order, which prohibited him from selling securities. Mr. Hollenbeck testified for three days at the trial. The trial was three weeks. Mr. Hollenbeck testified for three days. His testimony was central to the prosecution of this case. His testimony was critical in establishing that Mr. Bartko knew that the investments that were obtained from the victims were the result of fraudulent activities engaged in by Mr. Hollenbeck. Mr. Hollenbeck testified repeatedly that Mr. Bartko, and he had talked about the fact that Mr. Hollenbeck would, in essence, violate the cease and desist order by selling securities that he was not allowed to sell. And that Mr. Hollenbeck was using false insurance policies and guaranteed rates of return. Two other witnesses who testified also were involved in the alleged Capstone fraud, and that was Ms. Lehman and Ms. Plummer. Their testimony also was critical to the government's case. Ms. Lehman also testified significantly that Mr. Bartko talked with her about ways to carry on the conspiracy by opening up a separate bank account. And also by refunding money or doing what was called the return trip. After trial, several months after trial, the government revealed to the defense that there was a considerable amount of Brady information that had not been disclosed to the defense. The government revealed to the defense for the first time that Mr. Hollenbeck had been interviewed. We knew he'd been interviewed, we'd been given the Jenks material, but that he had been interviewed pursuant to a proffer agreement. That his wife had also received a proffer agreement. That both Mr. Hollenbeck and his wife, Crystal Hollenbeck, had been advised that they were not targets prior to the time that they began their debriefing with the government. After that bombshell was revealed to the defense, the government then revealed to the defense, again, months and months after trial, that Ms. Lehman, the other critical witness, the other alleged co-conspirator, had received what was known as a statute of limitations tolling agreement. That she was also subject to being prosecuted. She was told that she was also under investigation for being prosecuted. But unbeknownst to the defense, we believed that the statute of limitations had already run, because the five years had already expired since the time of the crime. She had been told that the statute of limitations would be extended until approximately two weeks after trial. In other words, as we wrote in our brief, the Damoclean sword was over her head during the course of trial. Unbeknownst to the defense that thought the statute of limitations would run and that she had no motive to curry favor with the government. In fact, a tolling agreement had extended the statute of limitations, which meant that while she was testifying, she knew that within two weeks of the conclusion of her testimony, the prosecutors would make a decision whether to prosecute her or not. So, we have Brady violations with regard to the tolling agreement never being shown to the defense. We have Brady violations with regard to Mr. Hollenbeck's wife being told she was not a target and being given a proffer letter. We have Brady violations with regard to Mr. Hollenbeck being told he was not a target before his debriefing and being given a proffer agreement. And then we have Mr. Hollenbeck who actually testifies at trial and says that there were no agreements relating to his testimony. Well, the question that was asked of it, were there any promises made to you about your testimony here today about his testimony? Not about any promises that they made in the proffer. So, you've got to be a little precise to say that you were affected by that. Well, Your Honor, both the government and the district court, in the lower court's opinion, stressed the fact that we, the defense, in essence, would not be successful in a prosecution for perjury. And they cite the Harrison case and the Braunston case, which are the standards for actually prosecuting someone for perjury. But that's not the standard under Brady for a witness who clearly is providing misleading testimony. Don't you have to show us, though, that the interview testimony and the trial testimony overlapped? Because I agree with you that they can't hide behind the distinction that if he was sitting in an interview chair and said A, that it's okay for him to sit in a witness box and say A and it not be true. But there has to be some showing that there was an overlap and that he was, in fact, lying. Do you not? Well, the question . . . we were trying . . . Because if the testimony in the interview was totally different from the testimony, or if they didn't use any of the interview testimony, then . . . Excuse me. The lie was not revealing the existence of the proffer agreement. The lie was not revealing the fact that he'd been told he was not a target. Right. It wasn't an actual inconsistency. And we can't make that prejudice inquiry, can we, without determining the extent to which this testimony overlapped? Yes. It's undeniable that he had a proffer agreement. It's undeniable that he was told he was not a target. It's undeniable. These are all facts that the government concedes. The government concedes that his wife was told she's not a target before she began debriefing. It's undeniable that Crystal Hollenbeck, the wife, was also told that she would receive this proffer agreement, this protection by virtue of the proffer agreement. Then when he's on the stand, we don't know. It's been hidden from us. The government hasn't told us about all these agreements and these representations. That's the Brady violation. That's the initial Brady violation. It is compounded . . . In the final analysis, there was no consideration offered to him or his wife specifically for the testimony. And you, as Judge Floyd mentioned, you never specifically asked a question whether there was or not. But there's no evidence on the record that there was any specific consideration for their testimony. Well, we know that they actually got a rule . . . that Mr. Hollenbeck got a Rule 35, and we cited that. And we did question him about his Rule 35. But it seems odd that the government can play hide-and-seek with the Brady information about the existence of the proffer agreement, the protection he was given, the incentive he's given to remain a non-target, the incentive he's given to protect his wife, who he knew might otherwise become a target. Where in the record do you see that the debriefing was an exchange for him not being a target? That is just implicit, Your Honor. We contend that it is implicit when you go to someone who is conceding that he's involved in criminal activity and saying . . . And he's already in prison, by the way. He's in prison during this debriefing, based on his prior criminal conduct. And he is told, you're not a target, but we need to talk to you. Your wife's not a target, but we're going to talk to her, too. There's an implicit agreement we would contend. It's something the jury should have known. Let's put it that way. It's a significant piece of evidence about his credibility and his motivation. No, there's not a promise. His credibility, though, was pretty strongly attacked during this trial. Judge Dever, I think, made that point very clear . . . He did. . . . in his opinion. He did. Why don't you focus us, in your analysis, if you would, on Judge Dever's analysis . . . I will. . . . of this prejudice issue? Because, in determining materiality on Brady, we've got to find a reasonable probability of a different result, don't we? Or, that it affected the outcome of the trial. You're exactly right on the standard. And Judge Dever does articulate the standard, right? But, it's our contention that he misapplied the standard. And, let me explain a couple of ways in which he did that. First, you know, after he articulates Brady and Eggers and all the . . . Napiew and Giglio, he cites all the cases he quotes from the decisions correctly. But then, what he does is he engages in what would be more appropriately described as a kind of Jackson versus Virginia . . . you know, sufficiency of the evidence analysis. He says, look at all this evidence of Bartko's guilt. And, he then goes through all the government's evidence. He doesn't cite any of the defense evidence. He doesn't look at it from an impartial point of view, like the jury was doing, trying to figure out how significant was Hollenbeck's testimony. He discounts, and I put in the brief, 10 or 12 places in his order, where he says, the jury didn't have to believe Mr. Bartko. The jury could well have disbelieved everything Mr. Bartko said. Well, of course that's true. Of course that's true. But, the question under Brady is, would the jury have made those kinds of credibility decisions? Well, given the extensive record in this case, all this stuff is kind of cumulative. I grant you, when the AUSA gets out of them, I'm going to have something to say about how the Eastern District . . . Thank you. . . . has been doing things. Thank you. But, that aside, isn't the evidence in this case so overwhelming . . . No, sir. . . . it doesn't really affect anything? Your Honor, I . . . you know, everybody sits in trials. You know, maybe we all drink the lemonade, as we say. But, you know, the evidence at trial, Mr. Bartko . . . There were voluminous exhibits introduced, where he was telling Hollenbeck, you may not sell securities. You may not make misrepresentations. That's the documentary evidence. And then, the government elicits from Hollenbeck . . . If you just read nothing else, read his redirect examination. The redirect examination of Hollenbeck, where he testifies over and over and over again. Oh, those documents were all just a bunch of lies. They were CYA letters. What he was telling me to do, versus what he was writing to me. So, you had to believe Hollenbeck is our contention. The jury had to believe Hollenbeck that all these letters were just fakes. That these letters were just covering his . . . covering himself. That's why Bartko constantly was telling Hollenbeck, you know, you need to not sell securities. You're under a cease and desist order. You can only find and recommend people to me. And then, Hollenbeck says, oh, that's phooey. None of that was true. That's what was significant about his testimony at trial. And, if the jury didn't know about his credibility, didn't have all the information needed from his credibility . . . And, I would like to, if I could pause for a second, answer your question about the amount of impeachment. It's true, as Judge Deaver said. He was impeached. He was a con man. Everybody knew he was a con man. He admitted to being a con man. But, he said it was all behind him. He said, oh, that stuff I was doing, you know, whatever, years ago. That's when I was committing all these crimes. That's when I was deceiving people. And now, I found the Lord. And now, I'm in jail. And now, all I want to do is make it right. That was his words. What we didn't know is that he had these agreements with the government. What we didn't know is that he had these reasons to try to protect his wife. He had a current motive. He had a current motive to try to convince the government to let things stay as they were. As opposed to all the prior . . . As I put in the brief, listen, you could have ten prior burglary convictions. And, the government tells you about nine. Was it material that you didn't know about the tenth? Probably not. If the jury thinks nine burglaries isn't enough to disbelieve the person, the tenth wouldn't make a difference. But, if he also has an immunity agreement, or there's also something else that would motivate him now, as opposed to his prior conduct, which would cast doubt on his credibility, it's the current motive which was different. So, as the Coring case in the Ninth Circuit that we cite says, it's the . . . He didn't have an immunity agreement. He did not. Okay, go ahead. There was language I should point out. It's confusing. There was language in emails and in letters going back and forth from the government to the defendant saying, you know, enclosed is your immunity contract. But, they could only use his statements in the interview. Isn't that correct? No doubt about it. They could use any . . . This is not immunity. They could use any evidence. I am not going to argue with the fact this is not technically 6001 immunity. This is . . . This was a kind of standard proffer agreement that protected him. It protected him from what he said. We all know, I mean defense lawyers all know, once you get that, you've crossed the bridge. You're not going to be prosecuted. But, you're right. It is not a formal 6001 immunity agreement. I see my time has expired. I've reserved five minutes for rebuttal. Thank you. Arthur, thank you. May it please the court. I'm Christine Fritz from the Eastern District of North Carolina. And, with me at council table is David Bragdon. And, the government asks that you affirm the judgment of the district court in all respects. The government acknowledges that pursuant to its policy, these documents, the two proffer agreements, and also the lemon tolling agreements would have typically been disclosed. Well, Ms. Fritz, this is the second case I've sat on this week. And, I think you argued the other one, didn't you? I did. Now, it's time for the Eastern District of North Carolina to clean up its act. You're playing fast and loose. Our job's not here to protect the government. It's to make sure that you and Mr. Barco get a fair trial. And, there's a pattern over there. And, you need to have an open file discovery. You need to have an indexing system. You need to do something. There's been too many cases, two this week. So, go ahead. If I could add in on the same point. It's really gotten to the point, as far as I'm concerned, when I pick up a brief from your office, I'm looking for trouble. Two times last term, same thing. Misrepresentations, from my perspective, not being fully forthcoming. And, it's really creating a credibility problem for your office. And, you need to know about it. You need to get the word back. And, I certainly will communicate the panel and the court's concerns to the office. But, in this case, and in response to the concern about there being an open file type policy, there was significant discovery disclosed. There were thousands of pages that were scanned and copied and provided to the defendant. The defendant was given access to a room full of documents. These were our documents on the case. Dozens and dozens of boxes of bank records and everything else. And, here, there were these four documents, which, unfortunately, the AUSA had placed, not in the basement with all of the other stuff, but had placed in his correspondence folder. And, he mistakenly did not review that folder, thinking that there was nothing discoverable in that folder. And, in hindsight, determined that these documents would have been disclosed consistently. It gives the appearance of, and I think you should know this, it gives the appearance that the government has made an assessment that there's overwhelming evidence and that they're going to survive on appeal so they can do this kind of thing, in terms of conducting the course of its trials. That's the appearance that you're giving. And, I'm sorry that that's the impression that the court has, because we do have a broad discovery policy. We provide the defendant more than what is required under Rule 16, more than what is required under Brady and Giglio, specifically so that we aren't making those close calls. We don't want to make the close calls. We want the defendant to have, essentially, what we have. And, unfortunately, in this case, there were four documents that were not disclosed. And, importantly, although these documents were not disclosed, there is not a Brady or Giglio violation, because these documents, in hindsight, which is typically how a Brady and Giglio issue arises, in hindsight, these documents were not material. And, the Hollenbeck proffer agreements, they were not immunity contracts, as the court has noted. They provided very limited protection for one interview. There was a contract with Mr. Hollenbeck, and there was a contract with his wife. And, there was the statement communicated from the government to those individuals that they were not, at this time, targets. That is absolutely true. Advising an individual that they're not, at this time, a target, is not a promise that they will never become a target. The promise that was made to Hollenbeck and his wife was, specifically, that the statements that they provided during that interview would not, Barthko's statements, or, I'm sorry, Hollenbeck's statements would not be used against him. Hollenbeck's wife's statements would not be used against her. There was no cross-reference in the agreement, so the couple's statements could be used against the other spouse. And, with respect to how this evidence played in the trial, Hollenbeck was thoroughly impeached. He was impeached on all conceivable grounds, given the wealth of impeachment evidence. I'm not sure whether these agreements would even make the top ten. And, that's what the district court explained. After having reviewed all of the evidence, the court said that there is no reasonable probability that a different result would have occurred, had the defense had the Hollenbeck-Proffer agreements and been able to inquire about them. And, we submit that that is absolutely true. Let me ask you a question, Ms. Fritz. When the defense counsel asked, the government has not, as of this time, made you any promises, have they? Joint Appendix 580. Hollenbeck said they have not. Now, why wasn't it incumbent upon the government, at that point in time, to notify the court that, yes, that he had been made some promises. They weren't immunity contracts, but he had been made some promises, limited to his interview testimony. Are you saying they just forgot that they'd made those promises? I do believe that the AUSA who handled this had not recalled these agreements at the time. Oh, come on. You know, that just strains credulity, and let me tell you, I've been an appellate judge for twenty-eight years, and I have never made these kind of comments to a prosecutor, never. But, the increasing frequency from your office of this kind of conduct is really troubling, really troubling. And, you're standing here today saying that the prosecutor just forgot that they had made a promise to Hollenbeck, that his interview testimony wouldn't be used against him? Yes, that is what I'm saying. And, in fact, the district judge specifically found, as a fact, that this was a good faith mistake in oversight, and that was something that the district court had considered and had resolved that this was not intentional. There was not any deliberate effort to subvert the discovery of these materials. Well, I'll give you that. Judge Kennedy and I are very serious about this, and I understand it in the motion for a new trial that we're supposed to give you every reasonable inference, and the verdict shouldn't be overturned unless the evidence weighs heavily against it. I guess that's what you've got going for you in this case. I don't know yet. I think that what the government has going for us in this case is the fact that the judge who presided over this trial, after looking at the materials that were not disclosed, first of all concluded that individually they were not Brady or Giglio violations and conducted a thorough analysis of that. And the same judge who presided over this case and was most familiar with the evidence and the witnesses resolved that the confidence in the outcome of the trial was not undermined when this was considered either individually or cumulatively. And Judge Dever made clear that this was not a close case. There was ample evidence of the defendant's guilt. There were many witnesses who came forward and spoke about their roles in this fraud and how they were victimized. There were witnesses who discussed actually meeting with Mr. Bartko and Mr. Hollenbeck during which assurances and promises were made. I believe that was Ms. Robin Denny. This was a case in which there were, in a sense it was a puzzle, and different pieces of evidence came in from different witnesses, and they all corroborated one another. And the district court appreciated that and had concluded that even if this information had been disclosed, even if Hollenbeck was asked, did you receive a proffer agreement in 2009 that those particular statements were protected, even if they were aware that Ms. Lehman, there was still the possibility to prosecute her, that would not have undermined the confidence that the court had in the verdict. And under the new trial standard, and given that it is abusive discretion standard, we submit that the district court should be given deference. The district court conducted a very thorough review of the evidence. He published a 120-page order discussing at great length, and he acknowledged that he wasn't going to discuss all of the evidence. It simply, he was discussing some of the evidence that came in. And then he applied the correct legal standard and did a detailed analysis that certainly this court is left with a full understanding of what the district court, how the district court assessed the outcome of this case. So the government submits that that ruling should be affirmed. How about the contention that the sentence imposed was procedurally unreasonable? We submit that the district court did not err when calculating the advisory guidelines. And there's three specific claims of error that the defendant raises. And before getting into them specifically, I would like to note that the court announced an alternative sentence. And even if this court were to assume there were procedural error, the alternative sentence, based on the 3553A factors, is a basis upon which to affirm the judgment of the district court. Am I correct that at the end of the day he sentenced him below the guideline range? He did. He sentenced him below the guideline range. So to the extent there's a substantive challenge, there is a presumption on appeal that it's substantively reasonable. And what's important, however, is that the court, at the end of the sentencing hearing, the court spends, I believe, 20 pages talking about this defendant, talking about the 3553A factors. Responding to the arguments about disparities in sentencing. Responding to the mitigating arguments that the defendant, up until this point, had led a law-abiding life. There can be no doubt that the court discharged its obligation  And the district court can be taken at his word when saying, these were hotly disputed guidelines issues. I'm aware of that. I think I got it right. But I want everyone to know that this is the sentence that I believe is appropriate. And his analysis backs that up. Now, turning specifically to the different enhancements, with respect to the last calculation, the defendant doesn't challenge the monies that Caledonian Fund had received. He simply challenges whether the monies that the Capstone Fund had received, whether all of the monies that that fund had received should be held against him.  Whether the refund checks that were issued in early January 2005 were monies returned to the victims prior to the discovery of the offense. And second, whether the monies that were part of the interpleader in the Middle District of North Carolina, similarly were monies returned prior to the discovery of the offense. And the district court appropriately resolved that these were not. First of all, the refund checks, the district court explained, were part of a round trip of the money. Mr. Bartko did not intend to actually return all of that money to the individuals. They were instructed about how to endorse those checks over to Legacy, and Legacy was going to then get them back to the Capstone Fund. Only one of the individuals who received a refund check actually got and kept his money. There were some that were embezzled. The remainder were endorsed over to Legacy and then to Capstone. And the court found that, as a factual matter, that there wasn't an intent to return that money. Now, with respect to the interpleader, by the time the interpleader comes around, the defendant knew or had reason to know that this offense had been discovered. He knew well before May 2005. He was confronted by Alex—well, first of all, Curry and Bybee, North Carolina Agent Curry and also a victim, Bybee, had met and discussed the situation. At that time, the offense had been discovered. If there was any doubt about that, when Agent Rue of the SEC spoke with Bartko about the offense and confronted him with his involvement, that, too, is evidence that it was discovered. Now, with respect to the broker-dealer enhancement, the language of the guidelines is plain. If you are a broker or dealer or someone associated with them and your offense involves a violation of security law, you get an enhancement. It is different from the abuse of trust in which there is an obligation on the district court to find that the position of trust facilitated the commission of the offense. The amendment that added the broker-dealer enhancement was specifically added to reflect the additional culpability of people who have these positions, who are subject to additional fiduciary duties because of their licensing or because of their position, and nevertheless violate the law. Now, as to the number of victims, there's no dispute that there were 40 victims in Capstone. The defendant challenges the number of victims to be considered in Caledonian. Now, the monies themselves, it's fungible. Once these individuals were defrauded and the money went into a common pot, the government has acknowledged that it's not possible to trace a particular dollar to a particular person and then to a particular disbursement. So they share a pro-rata loss. Exactly. Let's take a look at the jury instructions in this case. I know they were overlapping players and similar objectives, but do you think that the court should have given an instruction on multiple conspiracies? No. And the law in the... Do you think there was enough dissimilarity here that perhaps the jury would have been better instructed if there had been such an instruction given? I realize that's not the sole test, but in this case, given the overlapping elements of this, do you think there was some invitation for confusion here? No. The multiple conspiracy instruction is not required unless the proof at trial demonstrates that the defendant was only involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment. And we submit that that is not met. The defendant was not involved in separate conspiracies unrelated to what was in the indictment. And some of the factors that are considered are key actors. And here you have the defendant, Franklin Asset Exchange, and Hollenbeck. And what's interesting is you also have the Caledonian Fund at one point who is contemplating using Hollenbeck directly and then eventually Darrell Laws decides to go his own way, but the idea of Hollenbeck raising money directly segues right into the Capstone Fund. You also have the methods of investor recruitment. These were essentially the same materials used over and over. You have the filtering of the investments through different funds. You have the goals, which were obviously to raise money and to invest, and also for personal profit. And you have the methodology that the funds were intending to use, which was the bridge loans to entities seeking short-term financing. Given all of those factors, this was not a situation where there were separate and unrelated conspiracies presented to the jury. With respect to the other jury instruction, I would point out that the defendant did not specifically request an accomplice or informant instruction. What they asked the court to do is provide an instruction specific to somebody who was facing sentencing or resentencing. And the court looked at its own instruction. No instruction had been offered by the defendant, and there is no Fourth Circuit-approved and promulgated jury instructions, and the version of Horns that was reviewed that we had doesn't have such a pattern instruction either. So you have a district judge who has not presented any proposed instruction. The idea of someone facing sentencing or Rule 35 is raised, and the court looked over its instructions and determined that its instruction appropriately covered that concern. Hollenbeck was facing a potential Rule 35, was he not? There was the possibility that the government might. He, in fact, got a Rule 35. He did. Okay. And for all these reasons, we ask that you affirm the judgment of the district court. Thank you. All right, thank you. Mr. Samuel? May it please the court, just a few points in rebuttal. First, the government talks about its open-file policy. Of course, an open-file policy, which more or less was what occurred in this case, can be deceptive if we're not led to believe that we need to make specific requests because when the government tells us, as they did in this case, well, we have an open-file policy, come into the basement at the U.S. Attorney's Office and look at everything, and we don't know that they're not putting everything down there, we're not given any incentive to make specific requests. So an open-file policy can actually be deceptive and can actually be detrimental to a discovery of what needs to be turned over, which, of course, is not what was turned over in this case. We know an indexing system would solve that problem. This is all the evidence we've got. We've got an index for it. You sign off on it that you've seen it. You wouldn't be here today. Right. I mean, the open-file policy in this case, there were, I don't know how many, 150 to 200 supposed securities victims. I mean, what we had was each one of their files, and we spent days and days and days up there going through each one. We're not going to find Brady with regard to hauling back in there. We're not going to find government discussions with the witnesses in there. We're just going to find the victims, the securities violations victims, just writing letters and asking where is their money and just their individual folders. That's what the open file was in this case as opposed to the conversations with the key government witnesses. I need to stress, too, if I can, this issue about the perjury and the misleading. It is our contention that the proper standard is not perjury. As I said before, the question of whether a witness testified untruthfully about an agreement isn't measured by the same standard as you would prosecute him for perjury. We're not asking Hollenbeck to be prosecuted for perjury. We are not the government seeking to prove that he knowingly, falsely made a misrepresentation. We're not trying to prove somebody guilty beyond a reasonable doubt. We're talking about whether the government had a duty to correct a misleading statement. The government knew that he'd had these agreements. They knew about these proffer agreements, the non-target letters. And that's really the duty is the government to correct that information, not whether I can be successful at, you know, I've never been in a USA, not whether I can prosecute someone for perjury. And I just, I know I don't have a whole lot of time. As with many Brady violations, you know, usually what happens is someone in the government tells the defense what they found. And I can't help, when I'm listening to you all talk about the Eastern District, that someone in the U.S. Attorney's Office did turn this over, and that's Mr. Bragdon who's sitting here today. And I can't help but say that, you know, but for his, you know, complying with his duty, turning this information over months later, we never would have found it. So I just, I can't sit down without noting that he's the one who finally turned all this information over to us, and we respect that. I also think it's important to note that Judge Deaver, though, he wrote a very erudite and very lengthy 118-page order. It is our contention, even though there's deference owed to his findings of fact, and we understand that, that he used the wrong standards when he goes through. And if you read his opinion time and time again, defendant didn't have to be believed. Defendant didn't have to be believed. And as I said during my opening remarks, we agree with that. But that's not the standard under Brady. The question is, if the information had been disclosed, would the jury have reached a different result? And again, I ask the court to review Hollenbeck's testimony, day after day after day of testimony. And in the end, you know, in redirect, in particular, in the citations there, joint appendix beginning on page 592, it's all 25 pages, 25 pages in the joint appendix beginning on 592, where the prosecutor says to Hollenbeck, did Barco tell you to sell the securities? Yes. Did Barco tell you to do this? Yes. Did Barco tell you to do the round trip, you know, this return of money that made them illegal unregistered securities? Yes. You know, what about all these letters from Mr. Barco where he says, don't do those things, comply with the law, don't pay any attention to it? That's why Hollenbeck's testimony was so critical. And yet Judge Deaver says, oh, Hollenbeck, he was nothing. He was insignificant. All you have to do is look at the documents to see that Mr. Barco is guilty. We think that is a clearly erroneous finding. When he says you can disregard, and Ms. Lehman, who's given the statute of limitations tolling agreement, who's facing a prosecution that we didn't know about, they'd specifically and expressly extended the statute of limitations for two weeks after trial. I mean, why would they have done that other than to keep that threat over her head? And then she comes on the stand and also testifies, Barco's the one who devised this scheme. Thank you very much, Your Honor. Thank you, sir. We'll come down to Greek Council at this time and then proceed to the next case.
judges: Barbara Milano Keenan, Henry F. Floyd, Henry E. Hudson